UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA  )
                          )
     v.                   )   Cr. No. 17-39-02 WES
                          )
LEANDRO GOMES             )
                          )
                          )

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, Chief Judge.

Defendant Leandro Gomes ("Gomes") was indicted for one count of conspiracy to sex traffic a child, in violation of 18 U.S.C. § 1594(c); one count of sex trafficking a child, in violation of 18 U.S.C. §§ 2, 1591(a)(1), (a)(2)(b), (b)(2) and (c); and two counts of transporting a minor interstate with intent to engage in criminal sexual activity, in violation of 18 U.S.C. §§ 2423 (a), (b). Gomes moves to suppress ("Motion") (ECF No. 55) his arrest, the search of his vehicle, all tangible evidence that law enforcement officers seized on April 17, 2017, and the subsequent search of his iPhone 5, on the basis that they are the product of a warrantless arrest without probable cause. The Court held an evidentiary hearing on the Motion on May 24 and 29, 2018 ("Hearing"). After considering the evidence and the parties' arguments, for the following reasons, the Motion is denied.

## I. Background

At the Hearing, the government offered the testimony of Detective Michael Iacone and Sergeant Lori Sweeney, both with the Special Victims Unit of the Cranston Police Department, and Officer Brian Corvese, also with the Cranston Police Department. The Court finds the following facts from their testimony.

On April 11, 2017, Detective Iacone received an anonymous tip that two juveniles were possibly involved in prostitution through Backpage.com ("Backpage") advertisements.[1] (Hr'g 1 Tr. 12:4-17, ECF No. 67.) On April 12, Detective Iacone, in conjunction with Special Agent Donaghy of Homeland Security, searched for and located a Backpage advertisement for the victim, a seventeen-year-old minor female named "NB." (Id. at 13:4-9.) The advertisement referenced NB as "H3nny," and provided revealing pictures of her and a cell phone number. (Id. at 16:18-20.)

Sometime before noon, Detective Iacone texted "H3nny" using the phone number provided on her Backpage advertisement to arrange an "in call" "date" for commercial sex.[2] (Hr'g 1 Tr. 19:1-10, 20:9-11, 21:1-6.) Detective Iacone testified that he intended his text message to identify solely where the prostitution was

---

[1] Backpage.com was a website used to advertise individuals for the purpose of commercial sex. (Hr'g 1 Tr. 6:6-7.)

[2] An "in call" is when the customer comes to the prostitute's location for sex. (Id. at 19:17-21.)

occurring.  (Id. at 25:12-15.)  Later that day, H3nny called Detective Iacone and specified an address of 15 Esten Street in Providence, Rhode Island.  (Id. at 26:24-25, 27:1-4.)  Around noon, officers cancelled that date with H3nny and took up a surveillance position in a parking lot where they had a clear vantage point of the 15 and 20 Esten Street area.  (Id. at 27:24-25; 28:1-10.)  20 Esten Street was significant to officers because it was Defendant Leandro "Leo" Gomes's home, which was diagonal from 15 Esten Street, the anticipated "date" location.  (Id. at 30:5-11, 32:15-19.)

At approximately 1:00 p.m., officers observed five individuals, three males and two women, exit 20 Esten Street.  (Id. at 33:18-19.)  Officer Iacone testified that he identified one of the women as the victim, "NB," by a distinct, upper-chest tattoo that he recognized from her Facebook page.  (Id. at 33:20-25, 34:1-9.)  After exiting the home, the men began working on a black Nissan Infiniti ("black Infiniti"), with a Texas registration plate, HPC4386.[3]  (Id. at 34:19-21, 35:1-15.)  Around 1:30 p.m., the two females and two of the men got in the vehicle and drove away.  (Id. at 37:3-5.)

Once the officers completed the surveillance, they returned to the station where they ran the vehicle's registration plate;

---

[3]  The vehicle was also described in police reports as a black Nissan Maxima.  (Hr'g 1 Tr. 36:4-21.)

information on it could not be gleaned from either the computer database normally used by Cranston Police Department or the Texas Department of Motor Vehicles. (Id. at 41:3-25, 42:1.) Officers also learned that NB was missing from a Department of Children, Youth and Families facility in Newport, Rhode Island, and that the second woman seen exiting 20 Esten Street was Andrea, an 18-year-old female recently released from the Rhode Island Training School. (Id. at 42:2-21.)

Around 1:30 p.m. on April 17, officers re-engaged with NB through text message using a different cell phone number, again trying to solicit a "date" with her. (Id. at 43:22-25, 44:18-20.) Officers successfully arranged an "out call date" for a "two girl special" for $500, which was to occur at an undercover apartment at 825 Pontiac Avenue in Cranston, Rhode Island, where Officer Iacone, Special Agent Donaghy, Detective Lee, and another Homeland Security Agent were positioned. (Id. at 44:9-12, 47:23-25, 48:1-13.) Other state and local police officers surveilled outside the apartment. (Id. at 51:4-7.) While on the way to the apartment, H3nny called the officers twice, once for directions and a second time to inform them she had arrived. (Id. at 49:15-20, 50:1-6.)

Once the officers knew that H3nny was in the vicinity of the undercover apartment, they radioed outside surveillance to look out for a "dark-colored sedan heavily tinted with this Texas plate" or a "black Maxima tinted with Texas Plates." (Id. at 51:16-24;

4

Hr'g 2 Tr. 52:19-21, ECF No. 68.)  Sergeant Sweeney surveilled the apartment from an undercover police vehicle parked directly across the street.  (Hr'g 2 Tr. 52:22-25, 53:1-8.)  He testified that:

> [O]nce [Detective Iacone] said that [H3nny and a second female] should be here, I observed a black tinted out what appeared to be a Maxima with Texas plates pass by my location. . . . I could see the . . . front passenger only.  The window was completely down.  It was a white female, brown hair.  She was on the phone.  She was kind of looking around and then focused to the entrance of the apartment complex.

(Id. at 53:25, 54:1-10.)

Sergeant Sweeney lost sight of the vehicle once it passed. (Id. at 55:1-5.)  Soon afterwards, she observed the white female passenger and a second female enter the apartment building, and radioed Officer Iacone to inform him.  (Id. at 55:17-18.)  Once the two females, one of whom Officer Iacone identified as NB, entered the apartment, they were taken into custody.  (Hr'g 1 Tr. 52:10-15.)  The other female identified herself as Justine Marzilli, who officers believed was twenty-eight to twenty-nine years old.  (Id. at 52:22-25, 53:1-6.)  Officers transported both females to the Cranston Police Station, where they were booked. (Id. at 54:7-10.)

After arresting NB and Ms. Marzilli, Officer Iacone radioed outside surveillance units to move in on the black Infiniti.  (Id. at 53:21-25, 54:1.)  Sergeant Sweeney testified that shortly after the females' arrest, Officer Corvese radioed in that he had located

the vehicle idling on Dixwell Avenue, approximately 200 feet from the main entrance of the apartment complex. (Hr'g 2 Tr. 32:12-25, 33:1-6, 56:15-25, 57:1.) Officer Corvese ran the vehicle's registration and learned that it did not match the vehicle. (Id. at 32:25, 33:1-3.) He pulled behind the vehicle and made contact with the driver, Gomes, who was alone and looking down at his cell phone. (Id. at 33:4, 34:4-5, 36:6-9, 37:22-24.) Officer Corvese could not tell what Gomes was doing on his phone, but it was illuminated. (Id. at 37:22-25, 38:1-6, 40:11-19.) Upon Officer Corvese's arrival and at his request, Gomes rolled down the driver-side window and provided a valid license, issued in his name.[4] (Id. at 36:13-15, 37:2-8.) Officer Corvese testified that Gomes appeared visibly nervous, stuttering as he spoke. (Id. at 38:9-17.) Gomes informed Officer Corvese that he was in the area to drop off a friend; he could not, however, provide an exact name or location for the friend. (Id. at 38:25, 39:1-11.) While Officer Corvese spoke with Gomes, Sergeant Sweeney and other agents arrived on the scene. (Id. at 40:1-4.) At Sergeant Sweeney's direction, Officer Corvese arrested Gomes for pandering. (Id. at 40:5-10.) Officer Corvese testified that he seized two cellphones from Gomes (the iPhone 5 and a white Samsung). (Id. at 40:20-25.) Around

---

[4] Gomes never provided the vehicle's registration. (Hr'g 2 Tr. 37:3-6.)

6:00 p.m. on April 17, Gomes was taken to the police station and booked. (Id. at 12:14-21.)

While at the police station, Ms. Marzilli told Officer Iacone that the juvenile had visited the apartment to engage in commercial sex and that she was there for her protection. (Hr'g 1 Tr. 54:19-21, 55:3-9.) Officer Iacone testified that, later that day the victim asked to retrieve two phone numbers from her cellphone, one for her mother, and another for her "uncle," "Uncle Sincere." (Id. at 56:3-12.) Officer Iacone knew the name Sincere from a previous investigation related to minor sex trafficking.[5] (Id. at 56:18-25.) Gomes was released from custody that evening on a $5,000 personal recognizance bond; police, however, retained his two cellphones. (Hr'g 2 Tr. 10:24-25, 11:1; Hr'g 1 Tr. 57:22-24.) On April 20, three days after his arrest, officers obtained search warrants for both of Gomes's phones. (Hr'g 1 Tr. 58:10-13, 60:4-6.) Officers could not obtain any information from the iPhone 5, because it had a passcode that officers could not unlock. (Id. at 59:2-22.) Officers did gain access to the Samsung, but it lacked any data or information. (Id. at 59:23-25, 60:1-3.)

On April 24, Agent Iacone and Agent Donaghy visited the victim, NB, at the Rhode Island Training School. (Id. at 60:7-10.) NB told them how she became involved in prostitution and that Gomes

---

[5] The name "Sincere" was confirmed as a nickname for Reysean Williams, a co-defendant in this case. (Hr'g 1 Tr. 57: 1-5.)

and his co-defendant would take her to multiple locations in Rhode Island, Massachusetts, and New York to have sex for money.  (Id. at 60:16-25, 61:1-2.)  On May 10, 2017, officers used this information to obtain federal search warrants issued by Magistrate Judge Sullivan for Gomes's iPhone 5.  (Id. at 61:6-8, 13-16.)

Gomes was later arrested and charged with four counts of sex tracking a minor.  This Motion followed.

## II.  Discussion

### A.  Probable Cause to Arrest

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  The constitutionality of a search incident to an arrest turns on the constitutionality of the defendant's arrest.  See Beck v. Ohio, 379 U.S. 89, 91 (1964).  To be constitutional, i.e., reasonable, probable cause must support a warrantless arrest.  See United States v. McFarlane, 491 F.3d 53, 56 (1st Cir. 2007).  Otherwise, evidence obtained by the illegal search is subject to the exclusionary rule.  Mapp v. Ohio, 367 U.S. 643, 655 (1961).

"[P]robable cause exists when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been or is about to be committed and that the suspect is implicated in its commission."  United States v. Flores, 888 F.3d 537, 543 (1st Cir. 2018).  Proof necessary to convict the

defendant of the crime is not required. United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir. 1987). To test for probable cause, the Court "examine[s] the events leading up to the arrest, and then decide[s] 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." Maryland v. Pringle, 540 U.S. 366, 371 (2003) (quoting Orenlas v. United States, 517 U.S. 690, 696 (1996)).

Here, officers knew at least the following at the time of the arrest: On April 17, officers were present at Cranston apartments as part of an ongoing investigation into prostitution of an underage female, NB. (Hr'g 1 Tr. 52:6-15.) Officers arranged a "date" via text message and phone call with H3nny, where she and another female were supposed to meet at the undercover apartment to engage in commercial sex. (Id. at 46:9-16.) The two females were transported to the apartment for the "date" by a black Infiniti with Texas Temporary Plate HPC4386. (Hr'g 2 Tr. 53:24-25, 54:1-10.) The two females entered the undercover apartment, where police took them into custody. (Id. at 55:17-22.) On both April 12 and 17, officers observed the same car with an identical license plate transport NB to or from two different locations where she had arranged to engage in prostitution. (Hr'g 1 Tr. 51:25, 52:1-5, 69:3-9, 70:12-15.)

In isolation, perhaps Gomes driving a car that dropped two women at an apartment might be unsuspicious. This fact combined

9

with the other circumstances of this case, however, suffices for reasonable suspicion of criminal activity. See Flores, 888 F.3d at 544 ("Attempting to analyze each piece of evidence in a vacuum is inconsistent with Supreme Court case law, which makes pellucid that each item is to be considered as part of the totality of the circumstances.") Other circumstances included: (1) the car's unique Texas license plate; (2) the car transporting the alleged victim from the location where she was supposed to engage in commercial sex on both April 12 and 17; (3) the car dropping off two women, including the alleged victim, at the undercover apartment to engage in commercial sex on April 17; and (4) Gomes, the sole occupant of the vehicle, sitting in the idle car on Dixwell Avenue, approximately 200 feet from the apartment complex's main entrance. See Grassia v. Piers, 427 Fed. App'x 18, 21-22 (1st Cir. 2011) (explaining that, in the context of an ongoing investigation, it was objectively reasonable for the officer to view the video image of a unique automobile, owned by the defendant and positioned at the crime's location, as suggesting the defendant's involvement in criminal activity). Accordingly, on April 17 it was objectively reasonable for the officers to suspect that Gomes was involved in transporting prostitutes.

Admittedly, as Gomes argues, this probable cause determination is somewhat of a close call, and the Court recognizes that the phone conversations between H3nny and the officers on the

way to the apartment do not compel the inference that Gomes knew
of their criminal activity. Officer Iacone testified that the
verbal exchange between the officers and H3nny that Gomes could
have overheard while driving only included the address of and
directions to the undercover apartment. (Hr'g 1 Tr. 49:12-25,
50:1-3.) Although it is certainly conceivable, there is no
testimony to suggest that Gomes, while driving the car, overheard
any incriminating information regarding the women's criminal
activity.[6] Gomes's presence in the vehicle during these
unrevealing phone calls alone does not suffice for the officers to
conclude that he should have known the women planned to commit a
criminal act. But one can easily infer, from the rest of the
evidence and applying common sense, that Gomes knew full well the
mission he was on. Cf. District of Columbia v. Wesby, 138 S. Ct.
577, 588-89 (2018) (explaining that officers could infer that
partygoers knew their party was not authorized because the
condition of the house, which appeared vacant, supported common-

---

[6]    Indeed, Officer Iacone testified that the incriminating
conversation between the officers and H3nny regarding the details
of the "date" (a "two girl special" and $500 payment) occurred via
text. (Hr'g 1 Tr. 44:9-12.) Previously, however, both parties
represented in their papers that this conversation occurred over
the phone ten minutes prior to the car arriving at the apartment.
(ECF No. 55 3; Resp. 5.) Had this been true, it certainly would
have been easier to impute knowledge of the criminal activity to
Gomes.

sense conclusion that most homeowners neither live in near-barren houses nor invite people over to trash their home).

In addition to the facts described above – Gomes's presence with the women as the dates were arranged; his driving them to the apartment; receiving and following direction sent by text and presumably relayed to him by the women – there is also his untruthful and evasive answers to police questioning. <u>Wesby</u>, 138 S. Ct. at 587 (citing <u>Devenpeck v. Alford</u>, 543 U.S. 146, 149, 155-56 (2004)). When the officer spoke to Gomes, who was sitting in the idling-black Infiniti, he could not concretely provide the name or location of the person he was supposedly waiting for. (Hr'g 2 Tr. 38:11-25, 39:1-11.) Gomes appeared nervous, agitated, and evasive, giving the officer further reason to discredit Gomes's response that he neither knew where his "friend" went, nor his/her name. (<u>Id.</u> at 38:25, 39:1-11); <u>Wesby</u>, 138 S. Ct. at 588 (explaining officer could infer from the defendant's nervous, evasive behavior that she lied about the party's host and the home's true owner).

The totality of the circumstances – especially the fact that Gomes was idling 200 feet from the undercover apartment in a car linked to underage prostitution – gave the officers probable cause to arrest Gomes for pandering. Because Gomes's arrest was grounded in sufficient probable cause, so too was the officer's search of his person and his vehicle. <u>See generally</u> <u>Beck</u>, 379 U.S. at 91.

B.    Seizure Incident to Arrest

Gomes subsequently moved to suppress the evidence seized from his iPhone 5, arguing that the officers illegally seized his cellphone because they lacked a reasonable belief that it was related to criminal activity.   The government argues that the officers had probable cause to believe that Gomes's iPhone 5 was related to criminal activity because cellphones are normally a key tool of any prostitution scheme.

"[T]he search-incident-to-arrest exception permits an arresting officer 'to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction' and to search 'the area into which an arrestee might reach in order to grab . . . evidentiary items.'" United States v. Wurie, 728 F.3d 1, 3-4 (1st Cir. 2013) (quoting Chimel v. California, 395 U.S. 752, 763 (1969)).   The Supreme Court has held "a search incident to the arrest requires no additional justification" if the warrantless arrest was lawful, i.e., based on probable cause.   United States v. Robinson, 414 U.S. 218, 235 (1973).   Because the officers had sufficient probable cause, their seizure of Gomes's iPhone incident to his lawful arrest does not offend the Constitution.

Here, Officer Corvese saw Gomes using his cellphone as he approached the vehicle.   (Hr'g 2 Tr. 37:22-25, 38:1-6.)   Gomes argues that it was not suspicious for him to use his cellphone

because phones are readily used in today's society. The Supreme Court, however, has endorsed the government's position, stating, "[c]ell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and can provide valuable incriminating information about dangerous criminals." Riley v. California, 134 S. Ct. 2473, 2493 (2014). Officer Corvese's observation of Gomes using his cellphone while occupying a car connected to criminal activity was sufficient for the officer to form a reasonable belief that the cellphone could provide valuable incriminating information. To ensure that Gomes did not attempt to conceal the phone, which was evidence in an ongoing investigation, Officer Corvese had the lawful authority to seize it. Thus, the officer's seizure of Gomes's iPhone incident to his arrest was constitutional.

C.  Inevitable Discovery and Independent Source Exceptions to the Exclusionary Rule

The government also argues that both the inevitable discovery doctrine and the independent source doctrine support the seizure of Gomes's cellphones during his arrest, assuming the unconstitutionality of Gomes's arrest, search, and seizure. Both doctrines are exceptions to the exclusionary rule, which prohibits admitting into evidence tangible material seized during an unlawful search. Flores, 888 F.3d at 545. The independent source doctrine allows trial courts to admit evidence obtained in an

14

unlawful search if officers independently acquired it from a separate, independent source. See Murray v. United States, 487 U.S. 533, 537 (1988). The inevitable discovery doctrine allows evidence to be admitted that would have been discovered even without the unconstitutional source. Nix v. Williams, 467 U.S. 431, 444 (1984). The Court discusses these doctrines successively.

1. Independent Source Doctrine

Under the independent source doctrine, "when evidence or knowledge would have been gleaned even in the absence of the earlier (unlawful) [arrest], such evidence or knowledge should not be excluded." Flores, 888 F.3d at 545. This exception serves to "deter[] unlawful police conduct" and ensure "juries receive all probative evidence of a crime," thus "putting the police in the same, not a worse, position tha[n] they would have been in if no police error or misconduct had occurred." Id. (internal quotations omitted). In this context, the Court must answer two questions:

> [W]hether the officers' decision to seek a warrant was made independent of what they had learned during their earlier (unlawful) entry, and if so, whether the affidavit that they submitted to procure the warrant, when stripped of any knowledge derived from the initial entry, contained enough facts to support a finding of probable cause.

Id. at 546 (citing United States v. Dessesaure, 429 F.3d 359, 367 (1st Cir. 2005)). Here, the Court answers yes to both questions.

The first question of whether the "officers' decision to seek a warrant was made independent of . . . [the] (unlawful) entry"

depends on the totality of the circumstances. <u>Flores</u>, 888 F.3d at 546. In <u>Flores</u>, the officers knew the following prior to the defendant's arrest: a tip was received that a "group of New Yorkers" was pushing drugs from a hotel; the only hotel room paid with cash was reserved under a New York address; the front-desk manager told officers there had been an unusual number of visitors "coming and going on a frequent basis"; after officers placed the hotel room under surveillance, officers observed what they believed to be a hand-to-hand drug transaction. <u>Id.</u> at 546-47. There, examining the totality of the circumstances, the court concluded that the information the officers knew independent of the arrest and warrantless entry provided a "strong indication that the . . . room [was a] hub of a criminal enterprise." <u>Id.</u> at 547.

Here, the government argues that the officers' decision to obtain search warrants was independent of the allegedly unlawful search of Gomes's iPhone. Three days after the arrest, officers obtained a state search warrant, but it was fruitless because the iPhone could not be unlocked. (Hr'g 1 Tr. 58:10-13, 59:2-22, 60:4-6.) On May 10, approximately one month after Gomes's arrest, the officers obtained a federal search warrant and were able to unlock the iPhone. (<u>Id.</u> at 61:3-16.) Officer Iacone testified that he would have sought a warrant for Gomes's phone whether or not it was seized at his April 17 arrest because, in human trafficking

investigations, evidence of the crime can be obtained from the suspected pimp's cellphone. (Id. at 63:6-11, 64:3-7.)

These circumstances are analogous to Flores, where the officer, after arresting the defendant for drug distribution, knew he would seek a search warrant for the defendant's room because hotel rooms are frequent criminal-activity hubs likely to uncover evidence. Because Gomes was arrested driving a car linked to a criminal investigation that dropped off two females at an apartment to engage in commercial sex, it was reasonable for officers to suspect Gomes of pandering and his phone of containing incriminating evidence. Thus, the officers had probable cause to seize the phone and obtain a warrant to search it.

In addition, the officers' decision to obtain a federal search warrant was based on the strength of the agents' interview with the alleged victim three weeks after officers seized Gomes's phone. (Hr'g 1 Tr. 60:16-25, 61:1-8.) This decision was independent of Gomes's arrest. Therefore, the officers' decision to obtain a search warrant was not based on any 'unlawful' search of Gomes's phone. The officers had probable cause to arrest Gomes and lawfully obtain a warrant before searching his iPhone.

The second question is whether "the affidavit that [the officers] submitted to procure the warrant, when stripped of any knowledge derived from the initial [search], contained enough facts to support a finding of probable cause." Flores, 888 F.3d

at 546, 548 (holding that even if the evidence obtained during the warrantless search was removed from the affidavit – the drug found in the apartment during the warrantless entry – what remained would suffice for probable cause and "thus . . . justify the issuance of the warrant"). It does. In this instance, the alleged victim's statement, which implicated Gomes in the prostitution scheme weeks after his arrest but before the officers obtained a search warrant for Gomes's phone, supports probable cause and therefore "justif[ies] the issuance of the warrant." Id. at 548.

## 2. Inevitable Discovery Doctrine

Next, the government urges application of the inevitable discovery doctrine to the iPhone seized from Gomes incident to his arrest. The inevitable discovery exception recognizes that, "if . . . the evidence . . . would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." Nix, 467 U.S. at 444. Application of the inevitable discovery exception invites three questions:

> [F]irst, whether the legal means by which the evidence would have been discovered was truly independent; second, whether the use of the legal means would have inevitably led to the discovery of the evidence; and third, whether applying the inevitable discovery rule would either provide an incentive for police misconduct or significantly weaken constitutional protections.

United States v. Almeida, 434 F.3d 25, 28 (1st Cir. 2006).

It is not appropriate to suppress the information found upon arresting Gomes, searching his person, and seizing his phones,

because the discovery of the information on the iPhone was inevitable. Here, Officer Iacone testified the he would have sought a warrant to obtain Gomes's phones even if Officer Corvese had not seized them during Gomes's arrest. (Hr'g 1 Tr. 64:3-7.) The "legal means" the officers used to obtain the federal warrant – the interview with the alleged victim subsequent to her arrest – was truly independent from Gomes's arrest. Before Officer Corvese stopped Gomes and subsequently arrested him, the alleged victim, NB, was already in police custody, and thus the use of NB's interview to obtain the warrant "would have inevitably led to the discovery of the evidence" in Gomes's iPhone. Almeida, 434 F.3d at 28; (Hr'g 1 Tr. 53:21-25, 54:1.) Finally, because the interview between the officers and the victim lawfully obtained, applying the inevitable discovery doctrine would not "erode [Fourth Amendment] protections or encourage police misconduct." Almeida, 434 F.3d at 29. Thus, under the inevitable discovery doctrine, suppression is not warranted as to the information obtained from the search of Gomes's iPhone.

D.  Delay in Obtaining a Search Warrant

Gomes argues that the three-day delay in obtaining a search warrant for his cellphones was unreasonable and violated his Fourth Amendment rights. The Court disagrees.

"A temporary warrantless seizure supported by probable cause is reasonable as long as 'the police diligently obtained a warrant

in a reasonable period of time.'" <u>United States v. Stile</u>, No. 1:11-cr-00185-JAW, 2014 WL 5106986, at *7 n.3 (D. Me. Oct. 10, 2014) (quoting <u>Illinois v. McArthur</u>, 531 U.S. 326, 334 (2001)). "The reasonableness of the delay between lawful seizure and seeking a warrant is up to the discretion of the court." <u>United States v. Boudreau</u>, Cr. No. 16-011-JJM-LDA, 2018 WL 1478037, at *1 (D.R.I. Mar. 23, 2018) (deeming reasonable the thirty-day seizure of the defendant's computer). Courts must "balance the privacy-related and the law enforcement-related concerns to determine if [an] intrusion was reasonable." <u>McArthur</u>, 531 U.S. at 331.

Here, the Court agrees with the government that the three-day delay in obtaining a search warrant was reasonable. Because Gomes's iPhone was seized in a search incident to his arrest for the trafficking of a minor for commercial sex, the Court must balance law enforcement's concerns for preserving evidence against Gomes's privacy interest. Similar to the court in <u>Boudreau</u>, the officers here – as aforementioned - had sufficient probable cause to believe the iPhone contained evidence of the arresting crime. In addition, by waiting to search his phones until they received a warrant three days after its seizure, the officers refrained from violating Gomes's Fourth Amendment rights. Thus, the three-day delay was permissible and did not violate Gomes's Fourth Amendment rights.

III.  Conclusion

Having found that sufficient probable cause supported the warrantless search and arrest of Gomes, and the subsequent searches of his cellphones, particularly the iPhone5, were conducted after the officers obtained valid search warrants, the Motion (ECF No. 55) is DENIED.

IT IS SO ORDERED.


_____
William E. Smith
Chief Judge
Date:  July 9, 2018